UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ELLENGEE MARKET CO., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-8929 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| PHENIX SPECIALTY FILMS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Ellengee Market Company, a meat distributor in Chicago, needed a better machine to vacuum-wrap corned beef, hamburger, and other meat products. After years of searching, its consultant located a used machine offered for sale by Phenix Specialty Films, LLC, in Florida. So the consultant trucked to Florida in a van, heavy-loaded with hundreds of pounds of meat, ready to put the machine to the test.

He spent a full day testing the machine. He wrapped package after package, running the meat through the machine several times. And he liked what he saw. He signed off on the machine, and brought samples back to Chicago for inspection. Ellengee promptly bought it.

The meat-wrapping machine turned out to be a lemon. From the very start, the machine was better at creating headaches than vacuum-sealed packages of meat. Customers returned the meat within a day or two, complaining about off-color meat that smelled bad. Ellengee concluded that the machine was not up to the task, so it asked for its money back. Phenix refused.

This litigation followed. After discovery, Phenix moved for summary judgment. Phenix argues that it made no warranties about the machine, and in any event, Ellengee had a full

opportunity to inspect it before purchase. For the reasons that follow, the motion is granted in part and denied in part.

## Background

Ellengee is a family-owned, wholesale meat, cheese, and produce distributor on the north side of Chicago. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 76-2). It sells to small restaurants, hot dog and beef stands, and so on. *See* W. Morrice Aff., at ¶ 1 (Dckt. No. 76-8). According to its website, it offers all types of meat for sale – steaks, burgers, poultry, pork, and the like. *See Ellengee Market Shop*, Ellengee Market, https://ellengeemarket.com /shop/ (last visited August 17, 2021). Its meat business requires meat packaging.

Ellengee packaged meat with a small, hand-operated machine, but it wanted a machine that could handle more product. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 5 (Dckt. No. 76-2). So Ellengee turned to Hank Robinson, a professional food technologist who had worked on and off for the company as a consultant for at least 15 years. *Id.* at ¶¶ 6–7.

The company asked Robinson to look for a better solution. As Robinson later explained, "[t]hey wanted to pack the corned beef and they wanted to pack hamburgers, they wanted to pack steaks in vacuum-pack." *See* Robinson Dep., at 35:18-21 (Dckt. No. 76-6).

Robinson hunted for a used machine because new machines were too expensive. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 8–10, 13 (Dckt. No. 76-2); W. Morrice Aff., at ¶¶ 3–4 (Dckt. No. 76-8). The search process lasted a few years. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 8–9. He pursued a number of leads and inspected some machines (the parties disagree about how many, but that dispute makes no difference here). *Id.* at ¶ 11; W. Morrice Aff., at ¶ 4.

Robinson eventually learned about a vacuum-packing machine that Phenix Specialty Films was offering for sale. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 76-2). But it wasn't nearby. Phenix is based in Florida. So Ellengee sent Robinson on the road to take a close look at the machine. *Id.* at ¶ 15. The purpose of the trip was to inspect the machine and evaluate its ability to perform vacuum packaging. *Id.* at ¶ 42.

He didn't go empty-handed. He went on a road trip with 400 pounds of corned beef and ground beef. *Id.* at ¶ 16. He brought multiple briskets, too. *See* Robinson Dep., at 59:17 (Dckt. No. 76-6). The goal was to run the machine and see how it wrapped the meat.

When he arrived at the plant, Robinson met with a few employees and took a look at the machine in question, a Multivac 5100. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 17–18 (Dckt. No. 76-2). They fired up the machine, and put it to work. "We ran the corned beef. We ran the ground beef." *See* Robinson Dep., at 52:6-7 (Dckt. No. 76-6).

Robinson and a group from Phenix ran the machine for hours. The testing began in the early morning on the day of arrival, and lasted until the mid-afternoon. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 76-2). They wrapped all 400 pounds. *See* Robinson Dep., at 57:24 – 59:2 (Dckt. No. 76-6). In fact, Robinson ran the meat through the machine "several times," meaning "[m]aybe three or four." *Id.* at 58:21 – 59:2; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26. If they wrapped 400 pounds two-and-a-half times, that's half a ton of meat wrapping.

The Phenix personnel did not limit his ability to inspect the machine or ask questions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21 (Dckt. No. 76-2). During his deposition, Robinson testified that Phenix was "very open." *See* Robinson Dep., at 60:7 (Dckt. No. 76-6); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21. Ellengee objects to that characterization, but it

3

doesn't offer any evidence that Phenix placed restrictions on Robinson's ability to inspect the machine. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 21.

The testing apparently was a success. Robinson testified that he "didn't see any sealing problems." *See* Robinson Dep., at 59:21 (Dckt. No. 76-6); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 28 (Dckt. No. 76-2). The only issue involved the size of the briskets – they were large hunks of meat, and they were right at the limit of what the machine could handle. *See* Robinson Dep., at 59:3-11; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27. Before leaving Florida, Robinson called Ellengee and reported that the "machine looks good." *See* Robinson Dep., at 69:24 – 70:1; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 29.

Robinson testified that "the machine, the workmanship that I saw down there, was – I thought it was very good." *See* Robinson Dep., at 70:8-9 (Dckt. No. 76-6). He thought it would meet customer expectations for meat packaging. *Id.* at 82:3-17. He was comfortable with his work on the inspection, too. *Id.* at 80:9-12.

Ellengee objects to those characterizations as opinions. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 32–33 (Dckt. No. 76-2). But Robinson was merely describing what he personally saw and did. And lay opinions are admissible. *See* Fed. R. Evid. 701. In any event, for present purposes, what matters is that Robinson had an opportunity to inspect the machine. And he took full advantage of that opportunity, putting hundreds of pounds of meat to the test.

Robinson returned to the plant the following day to pack up the vacuum-wrapped samples. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 76-2); Robinson Dep., at 53:7-12 (Dckt. No. 76-6). He loaded hundreds of pounds of meat into his van, and headed back to Chicago. *See* Robinson Dep., at 60:8-24. But he left one brisket for his hosts. *Id.* at 61:15-18; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34.

Ellengee doesn't think that Robinson returned to Chicago with hundreds of pounds of wrapped meat. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 76-2). But the weight of the meat is immaterial. Ellengee admits that Robinson "returned to Ellengee with the packaged samples for Ellengee to inspect . . . ." *Id.* at ¶ 47. The company "gave it away immediately when [he] returned from Florida." *Id.* at ¶¶ 34, 35.

Robinson recommended that Ellengee purchase the machine, and the company did just that. *Id.* at ¶¶ 47–48. On March 22, 2016, Ellengee signed and accepted Phenix's written Estimate, agreeing to purchase the machine. *Id.* at ¶ 48. The machine and accessories cost $40,250, plus $3,000 for installation. *See* Estimate, at 2 of 6 (Dckt. No. 74-6).

At some point (apparently before the sale), Phenix provided Ellengee with a written warranty. *See* Equipment Proposal, at 4 of 4 (Dckt. No. 76-7). Despite the looming importance of this fact to the dispute at hand, the parties gave the warranty almost no attention in their respective submissions under Local Rule 56.1, meaning the statements of material facts and responses. In its statement of material facts, Phenix did not mention the document with the express warranty at all. *See* Def.'s Statement of Facts (Dckt. No. 73). Ellengee, for its part, brought it up in one paragraph, but provided few details. *See* Pl.'s Statement of Additional Facts, at ¶ 51 (Dckt. No. 76-2).

The parties agree that Phenix provided a limited warranty to Ellengee, and agree that the Equipment Proposal is it. *See* Def's Reply to Pl.'s Statement of Additional Facts, at ¶ 51 (Dckt. No. 81); Equipment Proposal, at 4 of 4 (Dckt. No. 76-7). But the parties don't provide any other details. The Equipment Proposal was dated March 8, 2016, a few weeks before the sale on March 22, 2016. *See* Equipment Proposal, at 4 of 4 (dated "3/8/2016"); Estimate, at 2 of 6 (Dckt. No. 74-6) (signed on "03-22-16").

Whatever the backstory, the parties agree that Phenix provided an express warranty to Ellengee in writing, and that the warranty appears in the Equipment Proposal. That document spanned only two pages. It included the make and model of the machine, the price, and not much else. But it did include a provision entitled "LIMITED LABOR WARRANTY." That provision provided a warranty about the "Equipment," as follows:

> PHENIX SPECIALITY FILMS, LLC. (PSF) warrants that the Equipment will, upon delivery to Customer, be in good working condition under normal and proper use and service for a period of sixty (60) days following installation of the Equipment at Customer location. During the first 60 days should any repairs be needed due to failure from normal and proper use, PSF agrees to provide labor for repairs at no charge to the customer. This Limited Labor Warranty covers both labor and travel expenses for the PSF technician. It DOES NOT cover parts. Furthermore, PSF will not be responsible for, and this warranty will not cover, damage to the Equipment caused by accident or any damage due to improper service or operation of the Equipment, particularly as it pertains to water damage from improper wash-downs; or alteration of the Equipment or any use of the Equipment for any purpose other than its intended purpose.

See Equipment Proposal, at 4 of 4 (Dckt. No. 76-7).

After the sale, the machine arrived in Chicago. Phenix representatives installed the machine and trained Ellengee to operate it. *See* Pl.'s Statement of Additional Facts, at ¶ 52 (Dckt. No. 76-2).

Things quickly went south. Ellengee began packaging meat with the Multivac 5100, and within a few days, the customers brought it back. *Id.* at ¶¶ 59–60. The customers reported that the "meat would smell bad and had a weird color." *Id.* at ¶ 61.

Ellengee blames these problems on the Multivac, alleging that it had latent defects causing an inadequate seal. *Id.* at ¶¶ 64–65. Ellengee's food equipment expert, Curt Mayberry, identified two problems with the machine. *Id.* It was not removing all of the oxygen during the vacuum process, and it wasn't sealing the packages properly, either. *Id.*

6

Faced with smelly, discolored meat, Ellengee asked for a refund, but Phenix refused. *See* First Am. Cplt., at ¶ 13 (Dckt. No. 13). So, Ellengee then filed a lawsuit in state court. *See* Cplt., at 3 of 6 (Dckt. No. 1-2). Phenix removed the case to federal court, invoking diversity jurisdiction.[1] *See* Dckt. No. 1.

Ellengee filed an amended complaint, which spanned only four pages. *See* First Am. Cplt. (Dckt. No. 13). Count I is a breach of contract claim, and Count II is a breach of warranty claim. The warranty claim includes both express and implied warranties, including the warranty of merchantability and the warranty of fitness for a particular purpose.

After months of discovery, Phenix moved for summary judgment. *See* Dckt. No. 71.

## Legal Standard

A district court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported

---

[1] After reading the Initial Status Report for Reassigned Case (Dckt. No. 37), this Court *sua sponte* raised with the parties (several times) whether this case satisfies the amount-in-controversy requirement, given that the case involves the sale of a machine for less than $45,000. *See* 10/24/19 Order (Dckt. No. 42); 3/9/20 Order (Dckt. No. 54); 8/13/21 Order (Dckt. No. 82). The Court directed the parties to make supplemental filings. *Id.* In response, the parties confirmed that Ellengee demanded more than $100,000 in damages in its state court complaint. *See* Dckt. No. 59; *see also* Dckt. No. 58 (mistakenly pegging the amount at $75,000). The state court docket sheet reads as follows: "Ad Damnum: $100000.00." *See* Dckt. No. 59-1; *see also* Cplt., at 4 of 4 (Dckt. No. 1-2) (seeking "an award in excess of $100,000 for damages"). In later submissions (Dckt. Nos. 85, 87), the parties drew attention to a sentence in the state court complaint, which stated that the "machine, to become operable, needed a major overhaul costing between $80[,]000 - $100,000." *See* Cplt., at ¶ 16.b (Dckt. No. 1-2).

motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (quotation marks omitted).

The Court construes all facts and reasonable inferences in the light most favorable to the non-moving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex*, 477 U.S. at 322–23; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Discussion

### I.    Breach of Warranties

The dispute involves the sale of goods between merchants, so the Uniform Commercial Code applies. The parties seem to take it as a given that Illinois law applies (without explaining why), so the Court will too. No party argues that choice-of-law matters.

The contract in question covered both a machine and installation services. The UCC governs a "mixed" transaction of goods and services if the "dominant purpose" of the contract was the sale of goods. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc*., 199 Ill. 2d 325, 264 Ill. Dec. 283, 770 N.E.2d 177, 195 (2002) (holding that "if the contract is predominantly for the sale of goods, with services being incidental thereto, the contract will be governed by article 2[, but] if the contract is predominantly for services, with the sale of goods being incidental thereto, the contract will not fall within article 2"); *see also* 810 ILCS 5/2-102.

8

The dominant purpose of the contract was the sale of the Multivac 5100. Ellengee didn't buy the machine to assist with the services (like, say, buying a paint brush for someone who paints your house). Instead, Ellengee paid for services to install the machine. The services were incidental to the purchase of a good, not the other way around, so the UCC applies.

A contract can include express warranties in three ways. Warranties basically can come from a promise, a description, or an exemplar. Specifically:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

*See* 810 ILCS 5/2-313(1)(a)–(c).

A contract can include implied warranties, too. A contract for the sale of goods includes an implied warranty of merchantability, which means (among other things) that the goods "are fit for the ordinary purposes for which such goods are used." *See* 810 ILCS 5/2-314(2)(c). A contract for the sale of goods also includes an implied warranty of fitness for a particular purpose. If the seller "at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods," then the contract includes an implied warranty from the seller "that the goods shall be fit for such purpose." *See* 810 ILCS 5/2-315.

The implied warranties are default rules, but they're not set in stone. Parties can contract around them. And more importantly for present purposes, implied warranties can fall by the wayside when a buyer inspects the goods before buying them. *See* 810 ILCS 5/2-316(3)(b).

A.        **Breach of Express Warranties**

The first question is whether Ellengee came forward with evidence that Phenix made and breached express warranties.  This Court concludes that Ellengee's claim about the written warranty survives, but its claim about the oral warranties survives only in part.

"To state a claim for breach of express warranty, plaintiffs must allege that (1) the seller made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis of the bargain; and (4) seller guaranteed that the goods would conform to the affirmation or promise." *Baldwin v. Star Scientific, Inc.*, 78 F. Supp. 3d 724, 739 (N.D. Ill. 2015) (quoting *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 64 F. Supp. 2d 741, 747 (N.D. Ill. 1999) (applying Illinois law)).

Ellengee offered evidence of only one written warranty.  The Equipment Proposal contained a paragraph entitled "LIMITED LABOR WARRANTY."  *See* Equipment Proposal, at 4 of 4 (Dckt. No. 76-7).  Ellengee represented that "the Equipment will, upon delivery to Customer, be in good working condition under normal and proper use."  *Id.*

The existence of that express warranty is not disputed.  Ellengee also presented evidence that the machine was not, in fact, in good working condition.  After packing and selling the meat, some customers returned it within one day.  *See* Pl.'s Statement of Additional Facts, at ¶ 59 (Dckt. No. 76-2).  By day two, *all* of the meat was headed back to the store, carried by unhappy customers.  *Id.* ("By the second day all the meat was being returned."); *see also id.* at ¶ 60 ("Most of Plaintiff's customers returned the meat in several days.").  "The meat would smell bad and had a weird color."  *Id.* at ¶ 61.  Ellengee also hired an expert who identified two defects.  *Id.* at ¶¶ 62–64.

Needless to say, Ellengee's arguments might not pan out at trial. But the existence or non-existence of defects is for another day, and requires a jury. Phenix, for its part, blames Ellengee for the problems. *See* Def.'s Mem. in Support of Mtn. for Summ. J., at 2 n.1 (Dckt. No. 72) (arguing that "the problems Ellengee had with the machine are entirely its own fault [because] Ellengee refused to obtain the basic accessories necessary to operate the machine"). That's up to the jury, too.

Phenix attempts to recast the claim as a problem with installation. *See* Def.'s Reply, at 10–11 (Dckt. No. 80). But that's not what Ellengee is claiming at all. Ellengee blames the machine itself, not the installation.

In addition to the written warranty, Ellengee also claims that Phenix breached oral express warranties. It points to two oral promises. First, Ellengee alleges that Phenix orally represented to individuals at Ellengee that the machine was "fully refurbished." *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 1–2 (Dckt. No. 77). Second, Ellengee claims that Phenix represented that "the machine would safely vacuum seal meat packages to provide a usable shelf life of 14 days." *Id.*

Ellengee relies on a few pieces of evidence to support the notion that Phenix represented that the machine was "fully refurbished." It begins by pointing to testimony from Caie Morrice, Ellengee's floor manager, co-owner, and corporate representative at a Rule 30(b)(6) deposition. Morrice testified that the Phenix salesman, Adam Stankiewicz, told him that the machine was fully refurbished. *See* C. Morrice Dep., at 44:14 – 45:14 (Dckt. No. 76-4); *see also* Pl.'s Statement of Additional Facts, at ¶ 50 (Dckt. No. 76-2).

11

But there's a timing problem. Caie Morrice testified that Stankiewicz made those statements during installation. That is, Stankiewicz told him in May 2016 that the machine was fully refurbished, months after Ellengee agreed to buy it in March 2016.

Morrice testified that "Adam" told him that the machine was fully refurbished and in excellent condition "[w]hen we were setting up the machine . . . like [at] the very end of May. May 28th or something like that." *See* C. Morrice Dep., at 44:14 – 45:12 (Dckt. No. 76-4); *see also id.* at 22:10-12 ("Me, no. I never met anybody until I met Adam and Terry, when they came to show us how to work the machine."); *id.* at 26:8 – 28:24; *id.* at 27:21-23 ("I primarily only remember mostly just Adam from when he was installing the machine with Terry."); *id.* at 32:12-16 ("I just remember talking to Adam a little bit at least when setting up the machine and things like that. It seems like I saw him before that but I can't remember."); *id.* at 33:15-16 (responding "I don't know" and "I can't remember enough on that" when asked about any pre-installation conversation with Stankiewicz); *id.* at 33:19-21 ("The conversation I know I did have is when they were installing the machine and stuff . . . .").

Ellengee agreed to purchase the machine on March 22, 2016. *See* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶ 48 (Dckt. No. 76-2). The representation in question took place during installation in late May 2016, months after the parties had entered into a contract.[2]

---

[2] In its brief, Ellengee points to a short passage in the deposition of Caie Morrice (again, the corporate representative) where he suggests that a conversation with Stankiewicz could have taken place in March 2016. *See* Pl.'s Mem. in Opp. to Summ. J., at 6 (Dckt. No. 77). But the witness did not know when, exactly, the conversation took place. *See* C. Morrice Dep., at 30:11-12 (Dckt. No. 76-4) ("I don't know. I don't know the dates. I really don't."). The witness did not participate in the conversation himself, and the record does not reveal what was said. *Id.* at 32:3 ("I don't have any communication myself."). Even if someone from Ellengee did speak with Stankiewicz before the sale in March 2016, it wouldn't be enough. There is no evidence in the record that Stankiewicz told Ellengee – before the sale in March 2016 – that the machine was fully refurbished.

That statement came too late to form part of the "basis of the bargain." *See* 810 ILCS 5/2-313(a)–(b). A *post*-sale promise is not part of the *pre*-sale basis of the bargain. *See* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 10:19, at 797 (6th ed. 2020) ("One may legitimately argue that once a legally binding contract of sale exists, no additional statements of the seller are part of the basis of that bargain. Because the buyer has already agreed to the deal, the buyer cannot claim reliance on any additional statement in making the deal.").[3]

Ellengee points to another piece of evidence to support the notion that Phenix promised that the machine was fully refurbished. Ellengee argues that it "was represented by the Young brothers on behalf of Phenix that the Multvac [sic] machine was fully refurbished or rebuilt." *See* Pl.'s Statement of Additional Facts, at ¶ 50 (Dckt. No. 76-2). Ellengee cites a page from Robinson's deposition, but it doesn't lend much of a hand.

During that deposition, counsel asked Robinson if Phenix told him that "they had either installed new or had rebuilt all the significant components of the machine." *See* Robinson Dep., at 101:8-11 (Dckt. No. 76-6). Robinson's response was non-descript. He testified that "[w]e went through the machine pretty much part by part, and they said this is – we put this in new or we put this in – we rebuilt this." *Id.* at 101:13-16.

That cryptic passage can't give rise to a claim for a breach of an express warranty. Robinson did not testify that Phenix represented that the machine was fully refurbished. Instead, he testified that Phenix told him that they worked on the machine. According to Robinson,

---

[3] In certain circumstances, post-sale communications can constitute a modification of the contract. But it is "far from self-evident that a seller's postsale words uttered during delivery are an 'agreement of modification . . . .'" *See* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 10:19, at 797 (6th ed. 2020). And "any oral modification of a contract for goods costing more than $500 must meet the Statute of Frauds . . . ." *Id.* Even so, Ellengee makes no such argument here (and thus it is waived).

Phenix told him that they put in "this" and rebuilt "this." The record does not reveal what "this" meant. That this-or-that passage is too amorphous to support a claim. Evidence about "this" isn't enough to get to a jury.

Maybe there's some other passage in the transcript that could support a claim, but this Court has no duty to hunt and peck to find it. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ellengee also relies on an affidavit from William Morrice, its President, about the machine. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 24 (Dckt. No. 76-2). Ellengee cites the affidavit to support the notion that Phenix represented that the machine was "fully refurbished." *Id.* But that's not exactly what the affidavit says. According to the affidavit, "Stankiewicz advised Robinson, my brother and me that Phenix had a refurbished machine." *See* W. Morrice Aff., at ¶ 5 (Dckt. No. 76-8).

A refurbished machine isn't the same thing as a *fully* refurbished machine. To have a claim based on that affidavit, Ellengee would need to come forward with evidence that the machine wasn't refurbished at all. But Ellengee offers no such evidence. At best, Ellengee's expert opined that "this machine should not have been represented by Phenix as fully refurbished and rebuilt . . . ." *See* Mayberry Aff., at ¶ 9 (Dckt. No. 76-13). But that statement is not the same thing as saying that the machine wasn't refurbished at all.

That leaves the other oral warranty. According to Ellengee, Phenix represented that "the machine would safely vacuum seal meat packages to provide a usable shelf life of 14 days." *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 1–2 (Dckt. No. 77). Once again, Ellengee relies on statements that Stankiewicz (the Phenix salesman) allegedly made to Caie Morrice during installation. *See* Pl.'s Resp. to Def.'s Statement of Material Facts, at ¶¶ 23, 42 (Dckt. No.

14

76-2) (citing C. Morrice Dep. (Dckt. No. 76-4)).  Those *post*-sale promises were not part of the *pre*-sale basis of the bargain, so they can't support a claim.

Caie Morrice (again, Ellengee's corporate representative) also testified that keeping meat with good red color was critical to Ellengee.  According to Morrice, Robinson "talked about that with those guys" (meaning Phenix) when he looked at the Multivac 5100.  *See* C. Morrice Dep., at 34:14–20 (Dckt. No. 76-4).  As Morrice put it, the 14-day requirement "was automatic, because if I don't get that, what the hell good is the machine[?]"  *Id.*

That testimony is too amorphous to support a claim.  Offering testimony that a buyer and seller talked about Topic X is not the same thing as offering testimony that the seller made Promise Y about Topic X.

Robinson testified that keeping hamburger fresh for a week (not two) (but it makes no difference here) was "the goal."  *See* Robinson Dep., at 68:4-8 (Dckt. No. 76-6).  And he testified that Ellengee shared that goal with Phenix.  *Id.* at 70:16-21.  Fair enough.  But that's not the same thing as offering evidence that Phenix promised a one-week or two-week period of fresh-looking red meat.  The buyer's goal isn't the same thing as the seller's representation.

But Ellengee did offer one other piece of evidence.  Ellengee offered an affidavit from William Morrice, the President of Ellengee.  According to him, Stankiewicz promised that red meat would stay usable for 14 days.  "Stankiewicz advised Robinson, my brother and me that Phenix had a refurbished machine for corned beef and ground beef packaging that would safely vacuum seal and package the meat so that it would be usable and saleable for up to 14 days."  *See* W. Morrice Aff., at ¶ 5 (Dckt. No. 76-8).  The affidavit does not pin down the timeframe, but the sentences before and after covered the pre-sale period.  *Id.*

15

So, Ellengee offered evidence that Stankiewicz, on behalf of Phenix, represented that corned beef and hamburger would stay usable and saleable for 14 days. That testimony is enough to support a claim for an oral express warranty.

To sum up, on the express warranty claim, Phenix's motion for summary judgment is granted in part and denied in part. The claim about the written warranty survives. The claim about the oral warranty survives to the extent that it involves meat staying useable and saleable for 14 days. The Court grants summary judgment to Phenix on the rest of the oral warranties.

### B. Breach of Implied Warranties

Ellengee also argues that Phenix breached implied warranties. There are two implied warranties at issue: the warranty of merchantability, and the warranty of fitness for a particular purpose.

"To state a general claim for breach of the implied warranty of merchantability, a plaintiff must allege that '(1) the defendant sold goods that were not merchantable at the time of sale; (2) the plaintiff suffered damages as a result of the defective goods; and (3) the plaintiff gave the defendant notice of the defect.'" *Corwin v. Connecticut Valley Arms, Inc.*, 74 F. Supp. 3d 883, 891 (N.D. Ill. 2014) (quoting *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 64 F. Supp. 2d 741, 748 (N.D. Ill. 1999)). "To state a claim for breach of implied warranty of fitness for a particular purpose, plaintiffs must allege that (1) the seller had reason to know of the particular purpose for which the buyer required the goods; (2) the buyer relied on the seller's skill and judgment to select suitable goods; and (3) the seller knew of the buyer's reliance on its skill and judgment." *Id.* at 891 (quoting *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 957 (N.D. Ill. 2007)).

Implied warranties are default rules, meaning that they are gap fillers that presumptively apply. But not always. For examples, buyers and sellers can modify implied warranties through their course of dealing. *See* 810 ILCS 5/2-316(3)(c).

A pre-purchase inspection is another example. The UCC creates a carve-out when a buyer had a full opportunity to inspect the goods before the sale. "[W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." *See* 810 ILCS 5/2-316(3)(b).

The case at hand falls comfortably within that exclusion. Ellengee sent Robinson – a professional food consultant with 15 years of experience with the company – to Phenix to inspect the machine. They sent him across the country with hundreds of pounds of beef to evaluate the machine's meat-wrapping abilities.

Robinson put the machine (and the meat) through the ringer. He spent an entire day putting meat through the machine, testing its ability to seal the product. There's no evidence that Phenix limited the testing in any way. Robinson didn't simply run a few hamburgers patties through the machine, and call it a day. *See* Robinson Dep., at 57:24 – 59:2 (Dckt. No. 76-6). In fact, he ran 400 pounds of hamburger and corned beef through the machine "several times," meaning "[m]aybe three or four." *Id.*; Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 26 (Dckt. No. 76-2).

The record does not reveal how many packages of meat he prepared, or how much meat is typically in a package. But if he ran 400 pounds of meat through the machine, and did so three times, that's 1,200 pounds of packaged meat. If each package of meat weighed 5 pounds (which seems generous), that's 240 packages of meat. Whatever the exact number, it is undisputed that

17

he prepared lots and lots of packages of vacuum-wrapped meat. The sample size was more than enough to assess the ability of the machine to do its job.

Robinson wasn't the only one who looked at the samples. He brought the samples back to Chicago, and thus gave Ellengee a first-hand look at what the machine could do. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 34–35, 47 (Dckt. No. 76-2). Robinson testified that everyone in Chicago was pleased with the packaging. "[E]verybody looked at the packaging and seemed to be happy with it because then they wanted to make a deal with Phenix on the machine and the film." *See* Robinson Dep., at 61:1-6 (Dckt. No. 76-6). There's no testimony in the record that anyone at Ellengee rejected any of the wrapped meat that Robinson brought back from Florida.

In its response, Ellengee points to testimony from Robinson that a person might not know that a seal was bad for three or four days. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 28, 34–35 (Dckt. No. 76-2); Robinson Dep., at 105:13 – 106:1 (Dckt. No. 76-6). It makes no difference. Ellengee had in its hands all that it needed to evaluate the machine.

Robinson returned to Chicago with a large quantity of packaged meat. After making the journey, the meat "was given away to our employees or otherwise disposed of, immediately when it was returned from Florida." *See* W. Morrice Aff., at ¶ 8 (Dckt. No. 76-8). The employees were well-positioned to know if there was something wrong with the packaging. And if Ellengee really needed more time to evaluate the wrapping, it should not have thrown the rest of the meat in the dumpster.

Ellengee should have been able to spot any issues. Robinson packaged the meat on day one, in Florida. *See* Robinson Dep., at 52:21 – 53:6 (Dckt. No. 76-6). He packed up his van with the packaged meat on day two. *Id.* at 53:7-12. It's a long haul from Florida to Chicago, and

18

Robinson testified that it took him 20 hours. *Id.* at 61:7-9. At the earliest, Ellengee had the packaged meat in its hands on day three. Perhaps later.

The clock was ticking on the meat, and Ellengee should have known it. As a meat wholesaler, Ellengee undoubtedly knew that meat degrades over time, and knew that the caliber of the seal has an impact on the life span of the red meat. Ellengee was not exactly in the dark about how to check if the meat stayed fresh. If customers could see or smell that the meat was bad after a day or two, then Ellengee could too.

Ellengee argues that the defects were latent, so the opportunity to inspect would not have exposed the problem. *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 9–10 (Dckt. No. 77). It is true that the UCC treats latent defects differently, because a buyer can't be blamed for failing to discover an undiscoverable problem. *See* 810 ILCS 5/2-316(3)(b), cmt. 8 ("Nor can latent defects be excluded by a simple examination.").

But that's not this case. Ellengee's customers spotted a problem, prompting them to return smelly, discolored meat with a day or two. So Ellengee could have spotted a problem, too. All it had to do was wait.

Robinson explained that inspecting a wrapped package of meat is not particularly complicated. "But basically, it's – you take it out, you inspect it, you look at the package, you look at the seal, it looks pretty good, and that's it. . . . You might put a little pressure on the package to see if a seal pops, but other than that, not much. Not much is done." *See* Robinson Dep., at 104:9-23 (Dckt. No. 76-6).

Ellengee then points fingers at Robinson, claiming that he is no expert in meat-wrapping machines. *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 9–10 (Dckt. No. 77). The UCC does distinguish between professional buyers and nonprofessional buyers when it comes to

inspections. *See* 810 ILCS 5/2-316(3)(b), cmt. 8 ("A professional buyer examining a product in his field will be held to have assumed the risk as to all defects which a professional in the field ought to observe, while a nonprofessional buyer will be held to have assumed the risk only for such defects as a layman might be expected to observe."); *see also* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 13:13, at 1019–20 (6th ed. 2020) ("The comment then suggests a distinction between professional and nonprofessional buyers. For example, a governmental agency buying magnetic tape or a farmer purchasing feeder pigs will be held to have assumed the risk for any defects that professionals in their respective fields should have discovered upon examination. On the other hand, a lay person purchasing an automobile cannot be expected to discover subtle mechanical and design defects.") (citations omitted).

Robinson was not an uninformed novice. He was a consultant with 15 years of experience working for Ellengee. The road trip itself suggests a high level of trust. One wonders why Ellengee sent Robinson across the country with hundreds of pounds of meat to inspect a machine if he wasn't up to the task. The whole point of that trip was to see if the machine could wrap meat properly.

Putting that aside, it doesn't take an expert to see if meat is wrapped properly. Consumers aren't professional meat buyers, and they had no problem spotting the problem. If the meat was going bad, the meat had a way of letting people know.

Under the UCC, a buyer cannot bring a claim about implied warranties when it had an opportunity to inspect that product and should have discovered any defects. *See Trans-Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1259 (7th Cir. 1989) (granting summary judgment to the seller when the buyer "clearly tested the samples as fully as it desired"); *Budnick*

*Converting, Inc. v. Nebula Glass Int'l, Inc.*, 866 F. Supp. 2d 976, 1000 (S.D. Ill. 2012) (granting summary judgment to the seller when the buyer "tested the red tape" but decided "not to test the white tape"); *Alberts Bonnie Brae, Inc. v. Ferral*, 188 Ill. App. 3d 711, 135 Ill. Dec. 926, 544 N.E.2d 422, 423–24 (1989) (rejecting an implied warranty claim when the seller claimed that the engine was "completely overhauled," and when the buyer "inspect[ed] the used nursery equipment for such defects" after); *Willis v. West Kentucky Feeder Pig Co.*, 132 Ill. App. 2d 266, N.E.2d 899, 903 (1971) (affirming a verdict against a farmer who bought diseased pigs after he "examined the hogs"). Ellengee, too, bought the machine after a full opportunity for inspection, so it has no claim for breach of implied warranties.

Ellengee relies on a few cases, but none of them save the day. In *Economy Folding Box Corp. v. Anchor Frozen Foods, Corp.*, a court in this district held that a frozen seafood company could not have discovered the defects in shipping boxes. *See Economy Folding Box Corp. v. Anchor Frozen Foods, Corp.*, 2007 WL 844878, at *7 (N.D. Ill. 2007). But the problem was how the boxes stacked on pallets, and the buyer received only one box. The buyer couldn't discover problems stacking boxes if it had only one box. *Id.* This case is much different. Ellengee's representative received hundreds of pounds of wrapped meat, so it had everything it needed to see if the wrapping passed the smell test.

In the end, Ellengee inspected the machine as fully as it desired before agreeing to buy it. *See* 810 ILCS 5/2-316(3)(b). After packaging hundreds of pounds of meat, Robinson did not spot any problems with the machine. And Ellengee didn't spot any problems when Robinson returned with the vacuum-sealed samples. That inspection "ought in the circumstances to have revealed" any defects, so there are no implied warranties. *See* 810 ILCS 5/2-316(3)(b).

## II.     Breach of Contract

Ellengee also brought a freestanding claim for breach of contract.  *See* First Am. Cplt., at Count I (Dckt. No. 13).  But it covers the same ground as the breach of warranty claim.  *Id.* at Count II.  It is not clear why both claims belong here.

There is substantial overlap in the complaint between the two counts.  The contract claim alleges that the machine was "fully refurbished and was in excellent condition and ready to operate," and so does the warranty claim.  *See id.* at ¶¶ 6, 19.  Both claims allege that the machine was "defective," *id.* at ¶¶ 14, 20, and "inoperable," *id.* at ¶¶ 15, 17.  The claims seek the same relief, too.  The main difference is the allegations about implied warranties, which did not survive on the merits.

In its brief, Ellengee runs together the contract claim and the warranty claim.  Under the combined heading "Breach of Contract and Express Warranties," Ellengee mentions four issues, the second and third of which are redundant:  (1) the machine was never operational, (2) the machine was not fully refurbished and would not allow meat to have a 14-day shelf life, (3) the machine was "fully rebuilt or refurbished," and (4) the machine produced leaky or faulty seals, and thus was not in good working condition.  *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J., at 3–4 (Dckt. No. 77).

Ellengee's express warranty claim covers all of those issues.  There is a genuine issue of material fact about whether Phenix breached its written warranty that the machine was in "good working condition."  And there is a genuine issue about whether the machine could seal meat and keep it fresh for 14 days.  But there is no genuine dispute about whether Phenix represented that the machine was "fully refurbished," because Ellengee came forward with no evidence that Phenix made that representation before the sale.

22

As a result, it's not clear what independent work Ellengee's breach of contract claim is supposed to do. Both claims sound in contract, and there is no apparent reason why both claims are in the case. *See Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 717 (7th Cir. 2021) ("Moreover, as the district court pointed out, Horne's breach of warranty claim sounds in contract . . . .") (citing *Collins Co., Ltd. v. Carboline Co.*, 125 Ill. 2d 498, 127 Ill. Dec. 5, 532 N.E.2d 834, 838 (1988) ("[A]n express warranty is imposed by the parties to a contract and . . . an action for breach of express warranty is an action ex contractu.")). Ellengee cannot recover twice by making the same claim in two counts. Keeping them both would accomplish nothing, except confusing the jury.

The contract claim does not belong here, partly because it is duplicative, and partly because it fails for the same reasons (and to the same extent) as the warranty claim. To the extent that the contract claim involves allegations about the machine being in "good working condition," and allegations about the 14-day period for the meat, it is duplicative of the warranty claim, and thus is dismissed. To the extent that the contract claim involves allegations about other representations (as covered in the section about the warranty claim), the Court grants summary judgment to Defendant. *Cf. Rich Prod. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 982–83 (E.D. Wisc. 1999) (granting summary judgment on a breach of contract claim where the plaintiff "offer[ed] no argument that the breach of contract claim is somehow factually distinct from the breach of warranty claims").

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Phenix's motion for summary judgment.

Date:    August 24, 2021

_____

Steven C. Seeger
United States District Judge